Good morning, Your Honors. May it please the Court, Kimberly Culp, Counsel for Appellant Kenneth Friedman. With me is Co-Counsel Tyler Baker and Julie Knuckleburg. I'd like to reserve two minutes of my time for rebuttal. With the Court's permission, Ms. Knuckleburg will deliver rebuttal. Thank you. This case is about the defendant's arbitrary and suspicionless search of our client, Mr. Friedman, for the purposes of obtaining evidence to solve cold cases. Neither justification asserted by the defendants in this case is a reason for affirming the District Court's grant of qualified immunity. In my time before the Court, I will spend a moment discussing the defendants' purported reliance on the Montana Statute and then turn to their new assertion that this Court can affirm based solely on the application of the totality of the circumstances, even in the absence of a controlling statute. With respect to the Montana Statute, there are three reasons why this Court should reverse the District Court. The first is there are a number of material factual questions, which when all inferences are drawn in Mr. Friedman's favor, show that the defendants did not rely on the Montana Statute at the time of the search. And even if the defendants did rely on the Montana Statute, the statute as a matter of law does not apply to Mr. Friedman because it does not permit the compelled taking of DNA from a person who has been fully released from Montana supervision, as was Mr. Friedman. And finally, the defendants, as Nevada authorities, had no authority to apply Montana law in Nevada. If we accept what you say is true, can you why do you think that it was clearly established that the constitutional rights were violated? Yes, Your Honor. With respect to the Montana Statute, it was clearly established the law was violated because as an initial matter, there's no reason for the defendants to conclude that they could apply Montana law. The United States Supreme Court had held in EEOC v. Arabian Oil that there is a presumption against the extraterritorial application of a statute. And there's no evidence in this case that the Montana Statute had any extraterritorial application. What about the letter from Bill Slaughter? Couldn't the officers reasonably rely on that letter to conduct the search? No, Your Honor. The officers could not reasonably rely on that letter as the sole basis for conducting the search, for a number of reasons. The first of which, the letter was more than a year stale at the time that they conducted the search. So the letter doesn't allow the defendants to know that they, at that moment in time, had a right to take the DNA from Mr. Friedman. At the bare minimum, they should have contacted the Montana Attorney General's Office to determine whether or not a search had been taken, whether or not Montana still wanted the DNA. They could have also contacted Sergeant Keller in the Clark County Department to determine whether or not he had, in fact, taken the DNA from Mr. Friedman. What is in the record about what the DA told the officer to do? The record, Your Honor, reflects that the DA instructed Detective Boucher to take a DNA sample from Mr. Friedman. Aside from that, there is no record evidence as to what Defendant Luzach told Detective Boucher with respect to the search. So Detective Boucher is sort of... But as a practical matter, officers and DAs frequently work together, and a lot of times, you know, that officers would like to do things that the DAs tell them not to do, but when the DA says, go do this, doesn't that somehow factor into the second prong of sautier? It does factor into the second prong to the extent that Detective Boucher was instructed to conduct the search. However, even the cases that the defendants have relied on state that when the officer has a reason to believe that the search might be unlawful, solely relying upon the Deputy DA is not enough to grant qualified immunity to the detective. Here, at the bare minimum, the defendant should have presented some evidence that Detective Boucher recognized the possible unlawfulness of the search and questioned Luzach, or that she told him, don't worry, it's okay, you can conduct the search. But the mere instruction to conduct the search without any other evidence is not enough to grant Detective Boucher qualified immunity. And certainly, with respect to Defendant Luzach, she should have conducted some investigation as to whether or not she had the right to search Mr. Friedman, whether or not Montana law permitted her to conduct the search, whether Nevada law permitted her to apply Montana law. Well, I guess, you know, is it reasonable to think that officers have to do, you know, a Lexis or Westlaw search on extraterritorial application? I mean, I have a hard time understanding that, you know, on the reasonably established. But I do want to ask you about on the sort of on the Fourth Amendment rights of your client at the time. Obviously, you know, the State's got a couple of interests in terms of, you know, the State's got an interest in identifying people and also in, you know, in crime solving and crime prevention and protection of society. You know, your client was under arrest at the time. That's not contested. He'd been arrested for a new charge of lewd behavior. I don't know what's happened on that, but we're talking he was also a prior sex offender, I think, out of two different States. Is there any doubt that, you know, in terms of if they had wanted to go, you know, do a body cavity search on him, search his cells, all of, you know, I mean, people that are under arrest and in an institutional, there's certainly dicta and there's case law to indicate that they basically don't have Fourth Amendment rights, that they're certainly in a different position. You're arguing that he's, you know, he's free from any of the problems that he had previously that he's rehabilitated. But the reality of the situation when all of this happens is he's under arrest for another crime in an institutional facility. And when I look at Supreme Court precedent in Sampson, you know, they talk about comparing parolees to prisoners. But there's an implication there that prisoners have less rights than parolees even. So I'm really struggling with what sort of rights your client had at that point. I'd like to address Sampson first. I think that that case is instructive to the facts of this case, because in Sampson, the court was still applying a statute that applied to a parolee, and there was a search condition  so on the continuum of privacy expectations that the United States Supreme Court has recognized, parolees have a greater expectation of privacy with respect to convicted and incarcerated felons, but a lesser expectation of privacy than an individual such as my client who had served his time and at the time was only an arrestee. But he's a prisoner at the time. You know, I mean, you have to obviously focus on the fact that, okay, he's already done with serving his 20 years in one place and his four years or five years in another place, but right then he's arrested on a new charge and he's a prisoner. He wasn't free to go. Yes, at that time he is an arrestee, but this court has still disallowed searches of a person's body, even to arrestees, and Fuller v. M.G. Jewelry, this court held that the arrestees in that case had suffered a Fourth Amendment violation and that the body cavity search in that case required the presence of probable cause and a warrant as required by the United States. Okay, but they can't they could print him. You can't contest that, right? He's under arrest, and that's for identification. Okay, and this is a buccal swab or however you say it. It's not a body cavity search, and I think that there are cases written, and maybe one even written by one of the judges on this panel here, that talks about the DNA's better identification than fingerprints. So where does that put you? The difference between a fingerprinting of an arrestee and the buccal swab in this case is that a fingerprinting is approved because it is part of a routine booking process. The buccal swab in this case was not part of any routine booking process, and the Fourth Amendment is designed to prevent the government from engaging in the random searches as this search was. It would be a different factual question if the buccal swab had been taken as part of a random booking as part of a procedural booking process like fingerprinting, but that's not. Does Nevada have its own DNA collection statute? Nevada does, but it does not apply to arrestees. It only applies at the time that the individual has been convicted and is part of their sentence requirement. Did the Deputy Attorney General, when she instructed Detective Butcher to take the swab, did she indicate whether this was under the Nevada statute or the Montana statute, or did she just say go get it? The record reflects that she just told Detective Butcher to grab the DNA, and the record also reflects that her reason for the search was to solve cold cases, not that she was relying on any statute either in Nevada or Montana. But when you, okay, when you, you don't need to look at that right now because we have questions. Okay. It's really not your time, it's our time. But I appreciate you looking. Now, you take someone's fingerprints, they put them in Alps and all of that, and they go and then they run that thing through, and they find out, oops, your client, you know, the fingerprint showed up at the scene of a murder, you know, going into, or oops, it showed up at, you know, on all these burglaries, on all of those type of things. Why is this any different? The search is different for two reasons. The first is that the person's DNA provides the government with a number of additional identifying characteristics that aren't obtained just from a person's fingerprint. The second reason is that the search in this case was a physical intrusion into Mr. Friedman's body, as opposed to the stamping of a person's fingerprint. And this Court and the United States Supreme Court have held that intrusions into the body are entitled to a greater expectation of privacy than, for example, a fingerprinting. The problem with the search in this case is that the search was conducted outside of any applicable statute, outside of any procedural limitation on the government's conduct. The warrant requirement limits the acts of the government. A statute limits the discretion of the searching officers. The defendants are asking this Court to approve of a suspicionless search limited by nothing, limited by no statute, not limited by any applicable warrant or court order. There is nothing to show that they couldn't have gone and gotten a warrant for his DNA. He was in their custody. There was no exigent circumstance. There was no risk of the evidence being destroyed. But they're asking this Court to say that they didn't need to get a warrant, that they didn't need a court order, and that they don't need a statute. Okay. Then, all right. So could have, would have, should have. Okay. That's on that. But then the fact that you're saying they could have, would have, should have, and they're saying that they don't need to, where's the clearly established? The clearly established. I mean, the fact that we're talking, spending this much time on it, makes me less and less sure that something like this is clearly established. Yes, Your Honor. The clearly established is this Court's holding in Fuller v. M.G. Jewelry that this Court, with respect to body cavity searches, requires that Schmerber v. California be met. And Schmerber v. California held that there must be the presence of probable cause in a warrant or an exception to the warrant requirement. Those facts weren't present in this case. There was no level of suspicion. There was no applicable warrant. There was no exception to the warrant requirement. That was clear at the time because both cases had been decided, and it would have been clear to a reasonable officer that a search in the absence of any statute or court order or warrant was unlawful under those circumstances. Thank you, counsel. Thank you. And we will give you two minutes for rebuttal. May it please the Court. Let me just clarify. I'm not actually from the Attorney General's Office. I'm from the District Attorney's Office. I'm a Clark County Deputy District Attorney. But identify yourself for the record. Robert Gower, a Clark County Deputy District Attorney.   a Clark County Deputy District Attorney. Lisa Lusich, as well as Detective Las Vegas Metropolitan Police Department Detective Boucher. But you know about the case. But what? But you know about the case. Oh, no, it's my case. I'm sorry. No, it's just I wanted to make sure because there's an NG. There is no Attorney General involved in this case. It's just myself. You'll need to speak up a little bit. I'm sorry. I apologize. That's fine. Basically, the issue here is really a qualified immunity, is can we appropriately rely upon the Montana statute in doing the buccal swap or buccal I think is what the metro people call it. And in this situation, I think that the biggest issue that's really here is there is not a clear established law. And, in fact, I think even to some extent the plaintiffs recognize that. And page 26 of their opening brief indicates that in every challenge to a statute authorizing suspicionless DNA testing of certain felons presented to this court, the statute has been challenged and thus analyzed under the facts of individuals still serving a criminal sentence of some sort either currently incarcerated or on probation, parole, or supervised release. In no circumstance has this court analyzed a DNA collection statute as applied to a person such as Friedman, a person who had served his time and was no longer incarcerated on probation, parole, or supervised release. And in the footnote 9, our research has also indicated that no court has ever addressed this question. That's exactly the idea for qualified immunity, when there's not an established law that clearly says we're not supposed to be relying on this Montana statute. But I think there's a broader question with respect to the Montana statute. I mean, there's no case whatsoever that would apply a statute like Montana's extraterritorially, would you agree? Do you have a single case? I don't have any DNA case that says that it would apply. It's not a DNA case. I'm just talking about the Montana criminal statute. You can't arrest someone in Nevada and charge them with a violation of the Montana statute. And that's absolutely correct. And we wouldn't have pulled him off the street and done this particular activity. What happened was he was actually under arrest on a separate charge that he was ultimately convicted of. But he was under arrest at the time. And what happened is as part of the arrest, there was a search. And I believe there's some references in Mr. Friedman's pleadings to an improper search that we obtained. That's where we received the letter from Mr. Slaughter, is during that search. And based on that, that's when we cooperated, and that's when we relied on the statute to be able to take it. Did you send the DNA to Montana? We did. You talk about in the search we received a letter from Montana. Is that in the record? No. All it is is the actual ‑‑ what's in the record is that there was a search. He makes some ‑‑ Mr. Friedman in several things, including his informal brief, which, of course, was replaced by the pro bono counsel's brief, he makes some references to this search. And I believe he actually filed, that I don't think was ever ruled on, was a motion for ‑‑ and I apologize for the term. I think it was a motion to prevent us from, the District Attorney's Office, from using those exhibits, the letter, the Montana statute itself, the judgment of conviction. And I believe there was one other document that was used in the motion to dismiss. So he filed that. This was before, of course, he had counsel. Was the Detective Boucher aware of the Montana letter at the time the search was conducted? He was the one, I believe, that conducted the search, and he's the one who found the letter, yes. So that he was not entirely clueless acting on the direction of Deputy Attorney General? He brought the letter to the deputy's attention because she was the one who was involved in the prosecution. And this was before the DNA was taken? Correct. So, yes, Mr. Boucher. Where's that in the record? It's not in the record. No, that's not. Procedurally, that's the reason this case is difficult, because I did this as a motion to dismiss. The court considered it as a motion to dismiss and, in fact, granted the motion to dismiss at the end of all the pleadings. I never filed any affidavits from any of the either Detective Boucher or the Deputy DA or anyone else because this was still proceeding as a motion to dismiss. So we don't know as a matter of a record in the case that there was a reliance on this letter at all, right? All I can tell you is that we say we did, and they say we don't. They don't believe we did. You know, I wrote one of the cases you cite, Shubilec, excuse me, which establishes in the Third Circuit, actually in the State of Delaware, that it's appropriate to collect DNA from convicted felons while they're still in prison or on probation. And one of the things that was of great concern to us in crafting that opinion was to make sure that there were very clearly defined boundaries and very clearly defined specification of how these samples could be taken, who they could be taken from, when they could be taken. And I'm concerned here that the Montana statute, if in fact it was brought to the attention of the Detective Boucher and the Deputy Attorney General, that they are simply moving forward without any understanding of what the statute says and what it means. And yet in this area of searches, isn't there a responsibility of law enforcement when they are executing an action under a statute to be fully aware of what the statute provides for and of its application to the particular situation? Yes. And again, I can answer that, but it's what I know that's not part of the record. Basically, when this information came in, the Deputy District Attorney, and I don't believe it was this Deputy District Attorney, but another attorney in our office, actually contacted Montana to find out what their take on the statute, whether it could be applied, did they want us to do any kind of buccal swab. And in fact, Exhibit A, which was the Exhibit A attached to my motion to dismiss, I hadn't realized to begin with until I received the reply that this was not just the statute. If you actually look at the Exhibit A, it has a note on it. It says, Felony offense is defined in 44-6-101 as any crime against a person, burglary, aggravated burglary, or any felony drug offense. Mr. Friedman was convicted of a crime against a person, a felony offense. Also, this DNA statute applies retroactively to anyone who was convicted after July 1st, 1989, or was in custody after July 1st, 1989. Mr. Friedman was in custody after July 1st, 1989. That's what we received back from Montana to confirm, because we wanted to make sure, in fact, that the statute did apply to him. We wouldn't have applied it otherwise. Now, Mr. Friedman has said he talked to the Attorney General's office, and they said, no, you don't have to report. So there you have it. I have no idea. I've got to tell you, Montana, I mean, because I'm from Montana, that I don't think there's any way that the Montana Supreme Court would endorse the extraterritorial application of this post-release from parole. And my guess is they probably would declare the statute unconstitutional anyway. But that's my educated guess. What I can tell you is, in terms of a deputy district attorney and a police officer when they're placed in that situation, the best thing they do is to contact the proper authorities, and they thought they did. They got the information and took the swab to send to Montana. And so that's why they declared it unconstitutional. Well, I appreciate you telling us that. How can we consider that on appeal, just on your say-so? I understand. The problem is, again, the record is difficult. All right. Based on the record that you have, why should you prevail? Well, I believe, first, there clearly is the Montana statute. Mr. Friedman was directed by Mr. Slaughter in his letter to comply with the Montana statute, as Mr. Slaughter understood. And Mr. Slaughter was the director of prisons for Montana. And he came in. He was arrested. In that situation, he's a convicted felon. He's under arrest. Very minimal privacy interest, specifically with respect to his identification. In fact, in Kincaid, on page 837, there's a reference. At the same time, the DNA profile derived from the defendant's blood sample establishes only a record of the defendant's identity. Otherwise, personal information in which the qualified offender can claim no right of privacy, once lawfully convicted of a qualifying offense, end in parentheses, indeed, once lawfully arrested and booked into state custody, parentheses. He was arrested, booked into custody on a separate charge, a Nevada charge. But you concede you had no probable cause to get his DNA at that point. We didn't at that point. That was, again, it relates back to the reliance on the Montana statute. Yeah, I mean, that's your argument. You don't claim probable cause. And I gather you're not claiming that you have a right to take these swabs or blood tests or any other invasive searches of people whom you merely arrest but have not been convicted, right? Under Nevada law, she quite correctly applied it. In Nevada law, it's after the conviction is when we can, and then there's a procedure for taking that particular DNA sample. Okay. So it rises or falls on the Montana statute? Rises or falls on the Montana statute and the qualified immunity argument, correct. Okay. Any further questions? No. Thank you, counsel. Thank you very much. We'll give you two minutes. Good morning, Your Honors. Julie Knuckleburg on rebuttal. Two points, Your Honors. First, appellees now state here at oral argument that they did, in fact, rely on the Montana statute. But as you have correctly pointed out, there are numerous questions in the record as to whether or not they actually did rely on the Montana statute. And it is for those errors that this court should, at the very least, reverse and remand back to the district court for further proceedings such as discovery to allow Mr. Friedman to determine whether they actually did rely on the Montana letter during their search. Furthermore, in their brief before this court, defendants no longer asserted that they relied on the Montana statute but instead asserted that they based their search on the totality of circumstances. Under clearly established law at the time, Schmerber and Fuller, searches of a body that intrude into the interior of a body required a warrant and probable cause. There needs to be some sort of procedure here to guide the government's discretion in taking these types and making these types of searches. It is that very purpose that the Fourth Amendment is set for, to prevent against arbitrary and capricious searches by government officials. Well, what is the clearly established law, though, on people that are in, that are prisoners regarding their Fourth Amendment rights? Prisoners do have a lesser expectation of privacy than an individual who is not under arrest. And what does the record establish that your client is? My client has been convicted of prior sexual offenses, and at the time he was under arrest in Nevada. So he's a prisoner? Yes. Okay. Well, he's a pretrial detainee, which do you think there's any difference between pretrial detainees and people who are serving time pursuant to a conviction in terms of their privacy interests? What is that? I do believe that there is a difference. Pretrial detainees do have different rights than an individual who has been convicted. They are in a different time frame of their criminal, not yet sentenced, but criminal activities. And the Supreme Court has noted that there is a continuum of privacy rights. At every stage, an individual is deemed to have different privacy rights than another stage. So you've got a convicted felon and someone that's arrested on offense in custody. Where is he on the continuum? On the continuum, while he might not have the full privacy rights. Tell me, is it clearly established where he is on the continuum? Clearly established, he would not be an individual who is incarcerated, but he would not be an individual who is free. Under Morrissey, this court recognized that individuals who are on probation are far different from an individual who is incarcerated. But he's not on probation? He's not on probation. He's not incarcerated pursuant to a judgment of conviction. He's a pretrial detainee, right? So doesn't Bell v. Wolfish, that line of cases, apply in terms of the rights? I apologize, Your Honor. I'm not familiar with that case. In this instance, Mr. Friedman is not incarcerated. He has yet to be convicted of his crime. He is under arrest. If there are procedures in place for standard booking procedures to take his DNA while he is under arrest, then that could possibly provide adequate procedures to allow for a Fourth Amendment search. However, here defendants had him in his custody for over a month before they took his DNA. There is no reason for them to not be required or not to know that they are required to obtain a warrant and probable cause or have some other exception to the warrant requirement. Again, under Schmerber and Fuller, that is clear. Fuller dealt with arrestees, and this court held that a visual body cavity inspection of an arrestee requires a warrant and probable cause and could not fall under the regulation that allows such visual cavity searches of individuals who are incarcerated. Could they search his cell any time that they wanted right then? You don't think that he had a Fourth Amendment right not to have his cell searched any time they felt like it, right? I believe they could do that, yes. But this is a search of his body, the interior of his body, and this court has held that such searches necessarily hold a greater implication of privacy rights than a search of a fingerprint or of somebody's cell. Well, is this as intrusive as a full body search? I would say yes. All right. So would you rather go to the dentist or the gynecologist? No, that's a difficult question to answer. I don't know. That's a difficult question to ask. Again, Your Honors, these appellees, their reliance on the statute, there are too many factual questions to allow this court to affirm the district court's holding. We do not know whether the defendants knew about the letter at the time, whether, as they assert now, Detective Butcher found the letter and presented it to Lou Zatch at the time. And on that basis alone, this court should reverse and remand to the district court for further proceedings. Thank you, counsel. Thank you. The case is heard and will be submitted. We'll proceed to the next case on the oral argument calendar for this morning, Naylor v. Firth.
judges: Roth (3rd. Cir.), Thomas, Callahan, Cjj